**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ABBY CASPER, individually and on behalf of all others similarly situated, | Case No. |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| DOTDASH MEREDITH, INC., | |
| Defendant. | |

Plaintiff Abby Casper ("Plaintiff"), individually and on behalf of all other persons similarly situated, by and through her attorneys, makes the following allegations pursuant to the investigation of her counsel and based upon information and belief, except as to allegations specifically pertaining to herself and her counsel, which are based on personal knowledge.

## NATURE OF THE ACTION

1.      This is a class action lawsuit brought on behalf of all persons who have subscribed to an email newsletter from ew.com (the "Website"), a website for Entertainment Weekly, which is owned and operated by Defendant DotDash Meredith, Inc. ("Defendant").

2.      Plaintiff  brings this action in response to Defendant's practice of knowingly disclosing its users' personally identifiable information ("PII") and video viewing activity to Facebook and other third parties without their consent.

3.      Specifically, the Website uses code called the Facebook Tracking Pixel to track what videos its users watch, and to then send that data to Facebook along with their PII, including their names and email addresses.

4.      The sharing of that data without the consent of Plaintiff or other consumers constitutes a violation of the Video Privacy Protection Act, 18 U.S.C. § 2710, *et seq.* ("VPPA").

## PARTIES

5.      Plaintiff Abby Casper is, and has been at all relevant times, a resident of New York, New York and has an intent to remain there, and is therefore a domiciliary of New York. Plaintiff created a Facebook account in approximately 2008.  Plaintiff has subscribed to newsletters from Entertainment Weekly since at least 2017 and, since that time, has viewed numerous videos on the Website.  Unbeknownst to Plaintiff, and without her consent, Defendant was sharing Plaintiff's video watching activity and her PII with Facebook through its use of the Facebook Tracking Pixel and similar technologies.  Indeed, data from Plaintiff's Facebook account confirms that Defendant disclosed such data to Facebook on several occasions.

6.      Defendant DotDash Meredith, Inc. is a Delaware corporation with its principal place of business at 225 Liberty Street, 4th Floor, New York, NY 10281.  Defendant owns and operates ew.com, which is used throughout New York and the United States.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under a law of the United States.

8.      This Court has personal jurisdiction over Defendant because Defendant is headquartered in this District.

9.      Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claim occurred in this District.

## FACTUAL BACKGROUND

### I.      The VPPA

10.      The genesis of the VPPA was President Ronald Reagan's nomination of Judge Robert Bork to the United States Supreme Court.  During the confirmation process, a movie rental store disclosed Bork's rental history to the Washington City Paper, which then published

2

it.  Congress responded by passing the VPPA, with an eye toward the digital future.  As Senator

Patrick Leahy, who introduced the Act, explained:

> It is nobody's business what Oliver North or Robert Bork or
> Griffin Bell or Pat Leahy watch on television or read or think about
> when they are home.  In an area of interactive television cables, the
> growth of computer checking and check-out counters, of security
> systems and telephones, all lodged together in computers, it would
> be relatively easy at some point to give a profile of a person and
> tell what they buy in a store, what kind of food they like, what sort
> of television programs they watch, who are some of the people
> they telephone.  I think that is wrong.

S. Rep. 100-599, at 5-6 (internal ellipses and brackets omitted).

11.     The VPPA prohibits "[a] video tape service provider who knowingly discloses, to

any person, personally identifiable information concerning any consumer of such provider."  18

U.S.C. § 2710(b)(1).

12.     The VPPA defines personally identifiable information as "information which

identifies a person as having requested or obtained specific video materials or services from a

video service provider."  18 U.S.C. § 2710(a)(3).

13.     A video tape service provider is "any person, engaged in the business, in or

affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette

tapes or similar audio visual materials."  18 U.S.C. § 2710(a)(4).

## II.     Facebook and the Facebook Tracking Pixel

14.     Facebook is the largest social networking site on the planet, touting 2.9 billion

monthly active users.  Facebook describes itself as a "real identity platform,"[1] meaning users are

allowed only one account and must share "the name they go by in everyday life."[2]  To that end,

---

[1] *Sam Schechner and Jeff Horwitz, How Many Users Does Facebook Have? The Company
Struggles to Figure It Out,* WALL. ST. J. (Oct. 21, 2021).
[2] FACEBOOK, COMMUNITY STANDARDS, PART IV INTEGRITY AND
AUTHENTICITY,

when creating an account, users must provide their first and last name, along with their birthday and gender.

15.     Facebook generates revenue by selling advertising space on its website.

16.     Facebook sells advertising space by highlighting its ability to target users.[3] Facebook can target users so effectively because it surveils user activity both on and off its site. This allows Facebook to make inferences about users beyond what they explicitly disclose, like their "interests," "behavior," and "connections."[4] Facebook compiles this information into a generalized dataset called "Core Audiences," which advertisers use to apply highly specific filters and parameters for their targeted advertisements.[5]

17.     Advertisers can also build "Custom Audiences."[6] Custom Audiences enable advertisers to reach "people who have already shown interest in [their] business, whether they're loyal customers or people who have used [their] app or visited [their] website." Advertisers can use a Custom Audience to target existing customers directly, or they can use it to build a "Lookalike Audiences," which "leverages information such as demographics, interests, and behavior from your source audience to find new people who share similar qualities."[7] Unlike Core Audiences, Custom Audiences require an advertiser to supply the underlying data to

---

https://www.facebook.com/communitystandards/integrity_authenticity.

[3] FACEBOOK, WHY ADVERTISE ON FACEBOOK, https://www.facebook.com/business/help/205029060038706.

[4] FACEBOOK, AD TARGETING: HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS, https://www.facebook.com/business/ads/ad-targeting.

[5] FACEBOOK, EASIER, MORE EFFECTIVE WAYS TO REACH THE RIGHT PEOPLE ON FACEBOOK, https://www.facebook.com/business/news/Core-Audiences.

[6] FACEBOOK, ABOUT CUSTOM AUDIENCES, https://www.facebook.com/business/help/744354708981227?id=2469097953376494.

[7] FACEBOOK, ABOUT LOOKALIKE AUDIENCES, https://www.facebook.com/business/help/164749007013531?id=401668390442328.

Facebook.  They can do so through two mechanisms: by manually uploading contact information for customers, or by utilizing Facebook's "Business Tools," which collect and transmit the data automatically.  One such Business Tool is the Facebook Tracking Pixel.

18.    The Facebook Tracking Pixel is a piece of code that advertisers, like Defendant, can integrate into their website.  Once activated, the Facebook Tracking Pixel "tracks the people and type of actions they take."[8]  When the Facebook Tracking Pixel captures an action, it sends a record to Facebook.  Once this record is received, Facebook processes it, analyzes it, and assimilates it into datasets like the Core Audiences and Custom Audiences.

19.    Advertisers control what actions—or, as Facebook calls it, "events"—the Facebook Tracking Pixel will collect, including the website's metadata, along with what pages a visitor views and what buttons a visitor clicks.  Advertisers can also configure the Facebook Tracking Pixel to track other events.  Facebook offers a menu of "standard events" from which advertisers can choose, including what content a visitor views or purchases.  An advertiser can also create their own tracking parameters by building a "custom event."

20.    Advertisers control how the Facebook Tracking Pixel identifies visitors.  The Facebook Tracking Pixel is configured to automatically collect "HTTP Headers" and "Pixel-specific Data."[9]  HTTP Headers collect "IP addresses, information about the web browser, page location, document, referrer and persons using the website."[10]  Pixel-specific Data includes "the Pixel ID and cookie."[11]

**III.    Entertainment Weekly and the Facebook Tracking Pixel**

21.    Entertainment Weekly's website ew.com is one of the most popular entertainment

---

[8] FACEBOOK, RETARGETING, https://www.facebook.com/business/goals/retargeting.
[9] FACEBOOK, FACEBOOK PIXEL, https://developers.facebook.com/docs/facebookpixel/.
[10] *Id.*
[11] *Id.*

news websites in the world.  It hosts numerous videos.

22.    Defendant offers various email newsletters to provide users with "the latest

entertainment news."  In exchange for these newsletters, subscribers must provide their email

addresses.  Through this subscription process, users also necessarily provide Defendant with

their IP addresses and cookies associated with their devices, which disclose the users' locations.

These tools increase Defendant's potential to urge subscribers to visit ew.com and watch videos

on it, making Defendant's relationship with these subscribers distinct from its relationship with

casual video-watchers on ew.com.

23.    Each of the Website's pages hosting videos contains code for the Facebook

Tracking Pixel.

24.    Among other things, the Facebook Tracking Pixel on ew.com is configured to

transmit PageView data to Facebook, which includes the URL for each video page and whether

that page contains a video:



25.    The URLs shared with Facebook describe the contents of the videos that they link

to.  For instance, ew.com hosts the trailer for the upcoming Brad Pitt movie called "F1" and the

URL for the page with that video is https://ew.com/brad-pitt-speeds-180-miles-hour-f1-trailer-

11695818.  Accordingly, when a user clicks on and requests a video, Defendant discloses to

Meta whether a video was requested (in contrast to the user requesting non-video material), the specific video name that the digital subscriber requested, the subject matter of the video, the URL, and the digital subscriber's FID to Facebook in a single transmission.

26.     Accordingly, the event data shared with Facebook permits an ordinary person to identify what videos an individual has requested or obtained.

27.     In addition, the Website contains code for at least eight different third-party Facebook cookies:

| Name | Value | Domain |
|---|---|---|
| fr | 1Kq9fq7JHUW9YkQvO.AW... | .facebook.com |
| c_user | 679395441 | .facebook.com |
| ps_n | 1 | .facebook.com |
| ps_l | 1 | .facebook.com |
| xs | 27%3AasgrOb2ovNSlPQ%3... | .facebook.com |
| sb | _MvhZhEX7ZeI9FAjN0dTN-n5 | .facebook.com |
| ar_debug | 1 | .facebook.com |
| datr | 9cvhZr5vG9HVMmQsnsSu... | .facebook.com |

28.     When someone who is logged into Facebook watches a video on the Website, the Pixel transmits PII from these Facebook cookies to Facebook along with their PageView data. For instance, the c_user cookie contains a visitor's Facebook ID.

29.     A Facebook ID is personally identifiable information.  Anyone can identify a Facebook profile—and all personal information publicly listed on that profile—by appending the Facebook ID to the end of facebook.com.

30.     The combination of the PageView data and the PII from Facebook's cookies embedded on the Website permits Facebook to see who watched what video.

## CLASS ALLEGATIONS

31.     **Class Definition:**  Plaintiff seeks to represent a class of similarly situated

individuals defined as all persons in the United States who watched a video on ew.com (the "Class"). Subject to additional information obtained through further investigation and discovery, the above-described Class may be modified or narrowed as appropriate.

32. **Numerosity (Fed. R. Civ. P. 23(a)(1)):** At this time, Plaintiff does not know the exact number of members of the aforementioned Class. However, given the popularity of Defendant's Website, the number of persons within the Class is believed to be so numerous that joinder of all members is impractical.

33. **Commonality and Predominance (Fed. R. Civ. P. 23(a)(2), 23(b)(3)):** There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class that predominate over questions that may affect individual members of the Class include:

> (a) whether Defendant collected Plaintiff's and the Class's PII and video viewing activity;
>
> (b) whether Defendant unlawfully disclosed and continues to disclose its users' PII and video viewing activity in violation of the VPPA;
>
> (c) whether Defendant's made these disclosures knowingly; and
>
> (d) whether Defendant disclosed Plaintiff's and the Class's PII and video viewing activity without their consent.

34. **Typicality (Fed. R. Civ. P. 23(a)(3)):** Plaintiff's claims are typical of those of the Class because Plaintiff, like all members of the Class, used Defendant's website to watch videos, and had her PII and video viewing activity collected and disclosed by Defendant.

35. **Adequacy (Fed. R. Civ. P. 23(a)(4)):** Plaintiff has retained and is represented by qualified and competent counsel who is highly experienced in complex consumer class action litigation, including litigation concerning the VPPA. Plaintiff and her counsel are committed to vigorously prosecuting this class action. Moreover, Plaintiff is able to fairly and adequately

represent and protect the interests of the Class.  Neither Plaintiff nor her counsel has any interest

adverse to, or in conflict with, the interests of the absent members of the Class.  Plaintiff has

raised viable statutory claims or the type reasonably expected to be raised by members of the

Class, and will vigorously pursue those claims.  If necessary, Plaintiff may seek leave of this

Court to amend this Class Action Complaint to include additional representatives to represent the

Class, additional claims as may be appropriate, or to amend the definition of the Class to address

any steps that Defendant took.

36.      **Superiority (Fed. R. Civ. P. 23(b)(3)):**  A class action is superior to other

available methods for the fair and efficient adjudication of this controversy because individual

litigation of the claims of all members of the Class is impracticable.  Even if every member of

the Class could afford to pursue individual litigation, the court system could not.  It would be

unduly burdensome to the courts in which individual litigation of numerous cases would

proceed.  Individualized litigation would also present the potential for varying, inconsistent or

contradictory judgments, and would magnify the delay and expense to all parties and to the court

system resulting from multiple trials of the same factual issues.  By contrast, the maintenance of

this action as a class action, with respect to some or all of the issues presented herein, presents

few management difficulties, conserves the resources of the parties and of the court system and

protects the rights of each member of the Class.  Plaintiff anticipates no difficulty in the

management of this action as a class action.

## CAUSES OF ACTION

### COUNT I
### Violation of the Video Privacy Protection Act
### 18 U.S.C. § 2710, *et seq.*

37.      Plaintiff brings this claim individually and on behalf of the members of the

proposed Class against Defendant.

38.    Defendant is a "video tape service provider" because it has created, hosted, and delivered dozens of videos on the Website, thereby "engag[ing] in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4).

39.    Plaintiff and members of the Class are "consumers" because they subscribed to Defendant's newsletters.  18 U.S.C. § 2710(a)(1).  This makes them "subscribers" and therefore "consumers" under the VPPA.

40.    Defendant disclosed to a third party, Facebook, Plaintiff's and the Class members' personally identifiable information.  Defendant utilized the Facebook Tracking Pixel to compel Plaintiff's web browser to transfer Plaintiff's identifying information, like her Facebook ID, along with Plaintiff's event data, including information about the videos she viewed.

41.    Plaintiff and Class members viewed videos on Defendant's website.

42.    Defendant knowingly disclosed Plaintiff's PII and video viewing activity because it knowingly installed the Facebook Tracking Pixel and other pixels and cookies on the Website.

43.    Plaintiff and class members did not provide Defendant with any form of consent, written or otherwise, to disclose their PII or video viewing activity to third parties.

44.    Nor were Defendant's disclosures made in the "ordinary course of business" as the term is defined by the VPPA.  In particular, Defendant's disclosures to Facebook were not necessary for "debt collection activities, order fulfillment, request processing, [or] transfer of ownership."  18 U.S.C. § 2710(a)(2).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff seeks a judgment against Defendant, individually and on behalf of all others similarly situated, as follows:

(a)  For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure, naming Plaintiff as representative of the Class, and naming Plaintiff's attorneys as Class Counsel to represent the Class;

(b)  For an order declaring that Defendant's conduct violates the statutes referenced herein;

(c)  For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

(d)  An award of statutory damages to the extent available;

(e)  For prejudgment interest on all amounts awarded;

(f)  For injunctive relief as pleaded or as the Court may deem proper; and

(g)  For an order awarding Plaintiff and the Class their reasonable attorneys' fees and expenses and costs of suit.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b)(1), Plaintiff demands a trial by jury of all issues so triable.

Dated: March 31, 2025                    **ARISOHN LLC**

                                         By:    */s/ Joshua D. Arisohn*
                                              Joshua D. Arisohn

                                         Joshua D. Arisohn
                                         94 Blakeslee Rd.
                                         Litchfield, CT 06759
                                         Telephone: (917) 656-0569
                                         Email: josh@arisohnllc.com

11

*Attorney for Plaintiff*